IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KELLY BRYAN DONAHUE,  :
    Plaintiff,  :
    v.  : Civil Action No. 02-224J
SERGEANT RANDY BEERS, TROOPER  :
MICHAEL MAYS, CORPORAL CARL P.  :
MEDSGER, CORPORAL YOHE, and  :
JOHN DOE PENNSYLVANIA STATE  :
POLICE TROOPERS,  :
    Defendants  :

## Report and Recommendation

### Recommendation

Defendants' motion for summary judgment, docket no. 37, is pending. I recommend that it be granted on the basis of qualified immunity.

### Report

According to plaintiff, on April 27, 2002, plaintiff was driving a vehicle and stopped at a traffic light in Dubois, Clearfield County, Pennsylvania, when he "became involved in" an exchange of words which escalated into a confrontation with two off-duty Dubois Borough municipal police officers. At the end of the encounter, the two officers told plaintiff that they were going to "settle things" when their friends arrived, and at that point identified themselves for the first time as police officers. These officers did not place plaintiff under arrest, and plaintiff left the scene in a law-abiding manner. Later that day, as he was getting into his automobile, plaintiff observed defendants Medsgar and May, Pennsylvania State Police troopers, drive in marked cars into the parking lot of the apartment complex where plaintiff

resided in Punxsutawney, Jefferson County, Pennsylvania. An officer of the Punxsutawney Borough Police Department, Petrovsky, also drove into the parking lot, and yelled at plaintiff to put his hands out of the car window. The troopers and the officer never told plaintiff why they were there, and plaintiff thought the officers were there to assault him because of the threats he had received earlier that day in the adjoining county. Plaintiff therefore drove away over the end of the parking lot and down a grass embankment to the highway, with the defendants in pursuit. Plaintiff became aware of the pursuit after some miles, but was aware of the pursuit at least for the last four or five miles, during which time plaintiff exceeded the speed limit. In the course of the pursuit, defendant Yohe crippled plaintiff's flight by deflating three of the tires on plaintiff's vehicle by using "stop sticks" laid in the road. Plaintiff continued for about a mile with his tires flattening. Defendant Mays was then able to bring his cruiser alongside plaintiff's vehicle and push it off the road and into a recently mown hay field. Plaintiff was unable to open his door because of the impact from Mays' cruiser and climbed out through the window, catching his shirt on a projection and deciding therefore to remove his shirt. Confronted by seven armed officers (five troopers, two Punxsutawney Borough officers) screaming at him to lie down in the field and be handcuffed, plaintiff attempted to negotiate his way to a clear spot by the

side of the road so that he would not have to lie down shirtless in the stubble. The defendants, seeing that plaintiff was unarmed, holstered their sidearms and almost immediately began spraying plaintiff with pepper spray. When plaintiff went to the ground and began to curl into a ball from the effects of the chemical spray, defendants repeatedly kicked him and struck him with their batons. After handcuffing the unresisting plaintiff, the troopers then dragged plaintiff to an upright position and then a standing position by hoisting him by his cuffed arms. The defendants took plaintiff first to the Dubois Regional Medical Center emergency room, then to the Clearfield County Prison.

The plaintiff asserts that the defendants violated the Fourth Amendment, which prohibits police officers from using excessive force in effecting the arrest of persons charged with crimes. See generally Graham v. Connor, 490 U.S. 386, 395 (1989); Tennessee v. Garner, 471 U.S. 1, 7 (1985). In this circuit, to decide whether police conduct constitutes use of excessive force, a court must determine, without engaging in Monday morning quarterbacking, the objective reasonableness of the arrest, considering the following factors: the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or others, and whether he was actively resisting arrest or attempting to evade arrest by flight, see Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir.2004), cert.

denied, 126 S.Ct. 236 (2005); Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004), the duration of the police conduct, whether the suspect was or may have been armed, and the ratio of police officers to arrestees. See Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir.1997). No physical injury is required to establish a Fourth Amendment claim in cases where no show of force is justified, see Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir.1995), but the extent or lack of physical injury is relevant to the question whether the force used by the police officers was excessive. See Grayer v. Edison Twp., 2006 WL 2241238, *4 (3d Cir. August 1, 2006)(citing Sharrar v. Felsing, supra, 128 F.3d at 822; Mellott v. Heemer, 161 F.3d 117, 123 (3d Cir.1998)( also citing Sharrar v. Felsing).

If the defendant police officers used excessive force, then the defense of qualified immunity must be examined. Qualified immunity operates to protect officers from liability at the "sometimes hazy border between excessive and acceptable force," and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. Couden v. Duffy, 446 F.3d 483, 492 (3d Cir.2006), quoting Saucier v. Katz, 533 U.S. 194, 206 (2001). The relevant inquiry is whether it would be clear to a reasonable officer that "his conduct was unlawful in the situation he confronted." Kopec v. Tate, supra, 361 F.3d at 776, quoting Saucier v. Katz, supra, 533 U.S. at 202.) That is, although the

right to be free from the excessive use of force is clearly established, qualified immunity protects defendants who in fact use excessive force "if, at the time they acted, they reasonably could have believed that their conduct" was not a use of excessive force. Mellott v. Heemer, supra, 161 F.3d at 121.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (internal quotations and citations omitted). The court must construe the facts in the light most favorable to the non-moving party. Doe v. Centre County, 242 F.3d 437, 446 (3d Cir. 2001). Where the plaintiff bears the burden of proving the elements of a claim, the defendants may present a prima facie case for summary judgment by "pointing out to the District Court [] that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The plaintiff is then required to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986): he must produce evidence sufficient to show that a reasonable factfinder might, following the applicable substantive law, return a verdict

for him.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).

Because the facts must be taken in the light most favorable to the nonmoving party, most of the evidence submitted by the defendants must be disregarded because it relates the encounter from their point of view. The description of the facts given by plaintiff related above must be taken as true. Under circuit precedent, plaintiff's account of defendants spraying an unarmed unresisting man with pepper spray and beating him with batons would present a jury question as to whether the force used was excessive.

However, turning to the question of what the defendant troopers reasonably believed they were doing, the following undisputed facts must also be taken into consideration. The defendant officers did not know that plaintiff believed they were there to beat him in retaliation for the earlier exchange with the Dubois Police Department officers, and in fact, the troopers were there to arrest plaintiff on a felony warrant alleging plaintiff had committed rape. Although there were seven troopers or officers involved in the arrest of a single person, that person was 6 feet tall and weighed either 225 pounds (defendants' brief) or 252 pounds (jail booking records), was intoxicated, and had a lengthy criminal record which included arrests for assaultive behavior, and at least some of that criminal history was known to defendant Yohe.

Although I must take as true plaintiff's allegations that out of fear he was yelling "don't shoot me," rather than defendants' allegations that plaintiff was "doing the Incredible Hulk thing" by ripping his shirt off and yelling "just shoot me," and at the particular moment of the arrest plaintiff alleges he was not physically resisting the officers, plaintiff indisputably had fled already from the officers in his car at a high rate of speed (a blood alcohol test taken after the arrest showed plaintiff's BAC to be .18%, well over the legal limit for operating an automobile,) and it had taken the disabling of his automobile to halt plaintiff. Further, by his own admission plaintiff did not obey the arresting officers' commands to lie down to be handcuffed, or even stop moving in response to the officers's commands. It may have been understandable for plaintiff not to want to lie down in stubble without his shirt, but the arresting officers had no reason to believe that plaintiff's movements were innocent. They had been advised that the plaintiff might have a weapon (and although plaintiff was apparently not charged with any weapons related offense, a pistol was later found under the seat of the vehicle plaintiff was driving) and the perceived threat of a moving person suspected to have a firearm, even if he does not have pistol in hand, is undoubtedly greater than someone believed to be unarmed. In Carswell v. Borough of Homestead, supra, the appeals court affirmed judgment in favor of an officer who fatally shot at point

7

blank range an unarmed man who was fleeing arrest for repeatedly violating a PFA order and threatening his estranged wife. Although the deceased man was unarmed, because there was evidence that he might be armed and the officer did not know that he was unarmed, even though "Snyder [the defendant officer] could see that the husband's hands were empty when he reached the front of the patrol car," 381 F.3d at 238, the officer did not use excessive force because: "A reasonable officer would not be expected to take the risk of being assaulted by a fleeing man who was so close that he could grapple with him and seize the gun." 381 F.3d at 243.

In this case, far less than lethal force was used. Although plaintiff's account that the defendants pepper sprayed and beat him despite his nonresistance must be believed, the objective evidence is that the combined effect of these seven officers' actions was to cause superficial bruises (a bruise on the upper right shoulder and on the right calf) and scratches (to the scalp, right wrist, right ring finger, and left shin) which never required any medical attention. When lodged in the Clearfield County Prison, plaintiff requested and received a lower bunk, which constitutes the extent of the further medical attention plaintiff sought, much less required, for his bruises and scratches. By plaintiff's own account of these injuries, they were about as severe as those frequently encountered by children in touch football games, and can be considered de minimis. The pepper

spraying left plaintiff's eyes sore and red, and inflicted great pain on him, but the defendants took plaintiff to the emergency room of the local hospital immediately after he was arrested and plaintiff had his eyes flushed with water by the emergency room physician.  The physician prescribed several days of eye drops as prophylaxis and ordered plaintiff to be given an ice bag to reduce the swelling of the tissue around plaintiff's eyes.  Plaintiff did not even seek further medical attention for his eyes, and there is no evidence that he suffered any injury other than transitory pain as a result of the pepper spray.  Plaintiff does allege that the handcuffing "damaged or broke ligaments in his wrist" but in the years since his arrest does not claim that he has even sought any further medical treatment for any injury.  At the time of his arrest, plaintiff did not complain to the defendants that the handcuffs were too tight, nor did he mention any injury either to the emergency room physician or to personnel at the jail.

Examination of circuit precedent compels the conclusion that defendants are entitled to qualified immunity.  In Kopec v. Tate, plaintiff Kopec claimed that defendant Tate, the officer who had arrested him for disorderly conduct, used excessive force. According to plaintiff, the officer had handcuffed him so tightly that within seconds he suffered so much pain that he almost passed out, that he had immediately informed the officer of this, and that the officer had taken at least ten minutes after plaintiff began

complaining of pain and numbness to check the tightness of the cuffs. Plaintiff also had medical evidence that the cuffs in fact had caused permanent damage to the nerves of Kopec's right wrist, requiring a year of medical attention. The appellate panel, splitting 2-1, reversed the district court's grant of summary judgment on the grounds of qualified immunity for two reasons. First, the panel held that the circumstances of the arrest hardly constituted an urgent or emergency situation that would have prevented the officer from checking the cuffs sooner: Tate was investigating a report that a couple was skating on a fenced off pond at an apartment complex, and was not even going to arrest the couple for criminal trespass, but Kopec refused to identify himself and insisted that his girlfriend not identify herself either. Second, the panel held that Kopec alleged "actual injury inflicted by a police officer in the course of an arrest, and supports his allegation with specific facts so that it cannot be said as a matter of law that the use of force was objectively reasonable." 361 F.3d at 778 n.7. In other words, the low level of criminality involved coupled with permanent injury made the reasonableness of Tate's actions a question for a jury.

In Couden v. Duffy, another divided appellate panel reversed the grant of summary judgment to state and federal officers who were engaged in a stakeout for a fugitive wanted on felony drug charges. The defendant officers, depending on which

version of the facts was believed, mistakenly believed that plaintiffs, a mother and her minor children who had driven up to their nearby house so that her 14-year old son, Adam Couden, could drop off his skateboard in the garage, were dropping off the fugitive, or that Adam was a burglar. According to the panel majority, although the officers had no reasonable suspicion, much less probable cause, to believe Adam Couden was engaged in any form of criminal activity, four officers jumped on Adam, one with a knee in Adam's back, pointed their pistols at his head and sprayed him with mace, then handcuffed him. This could constitute a Fourth Amendment violation, held the court.

By contrast, in Sharrar v. Felsing, the defendant officers assembled a 20-officer SWAT team, evacuated a neighborhood, and surrounded a house in the belief that the four men within were a man who had recently pistol-whipped his estranged wife in a nearby residence, and his three accomplices. The men, including plaintiff Sharrar, were ordered to exit the residence walking backward with their hands on their heads, and upon leaving were ordered to lie face down in the dirt while the officers, pointing automatic weapons at them, screamed at them that they were going to blow their heads off. Plaintiff Sharrar stated that while lying on the ground an officer had placed a gun to his head, and that he was handcuffed while or after an officer put his knee in Sharrar's back. The appellate court, after noting that Sharrar's

11

only claim of physical injury was alleged to have taken place later, affirmed the grant of summary judgment to defendants as to the claim of excessive force in the arrest, holding as follows:

> It does not follow, however, that the extreme methods used in effecting the arrests, such as requiring plaintiffs to lie face down in the dirt, with guns to their heads and vulgar threats, were constitutionally excessive, even though they caused plaintiffs' discomfort and humiliation.  128 F.3d at 821.

The appeals court went on to reason that although it had been error for the district court to focus solely on the lack of physical injury to the plaintiffs, that the lack of physical injury was a factor the court could take into consideration.  In the convoluted words of the Sharrar opinion: "We do not agree that the absence of physical injury necessarily signifies that the force has not been excessive, although the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality."  128 F.3d at 822.  The totality referred to by the court included the important fact that the defendant officers had probable cause to arrest the men for assault, and that the reported crime involved a firearm that was unaccounted for.

In Mellott v. Heemer, a divided panel affirmed the grant of summary judgment to deputy marshals who were alleged to have used excessive force in evicting a family from their farm after it had been sold by the bankruptcy court.  Even though the majority accepted plaintiff's allegations that the deputies had entered the

12

plaintiff's house by defendant Heemer sticking a pistol in plaintiff Bonnie Mellott's face when she answered the door, and that the marshals kept loaded shotguns and automatic weapons pointed at the plaintiffs throughout the eviction even though they presented no resistance to eviction, the majority found that a briefing the marshals had received that suggested the Mellotts might resist eviction justified the show of force. The majority observed that although the plaintiffs disputed the truth of the facts presented to the marshals, it was undisputed that the marshals had in fact been briefed that the plaintiffs might be armed and might resist eviction. In light of the information possessed by the marshals, "it was objectively reasonable for the marshals to load and point their weapons in an effort to discourage resistance and ensure their own safety." 161 F.3d at 123. Acknowledging that Wilkie Mellott had a heart condition and suffered chest pains from having weapons pointed at him, and that Bonnie Mellott had been pushed into a chair on two occasions, the Mellott majority also found it significant that the plaintiffs alleged no lasting physical injury.

In summary, although the plaintiff has introduced sufficient evidence to present a question whether defendants used excessive force, no reasonable person could find that the troopers believed or should have realized that their actions were violating plaintiff's rights. While it is possible to hypothesize that if

13

the defendants had allowed plaintiff to go where he wanted to and lie down where he wanted to there may have been no need for any use of pepper spray or the batons, the Fourth Amendment does not require arresting officers to risk their safety, or risk delay or failure in executing a valid felony arrest warrant, by using the least restrictive means to effect an arrest out of the fear of being sued.

Summary judgment should be entered in favor of all defendants.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have ten days to serve and file written objections to this Report and Recommendation.

DATE: 28 August 2006

Keith A. Pesto,
United States Magistrate Judge

Notice to:

Kirsten R. Rydstrom, Esquire
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, Pa 15219-1886

Craig E. Maravich, Esquire
6th Floor Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219